THE COLUMBUS COMPANY v. HURFORD.

## The Columbus Company v. Hurford.

1. AGENCY: *Continuance of the relation.* When the relation of principal and agent has once been established, it will be presumed to continue until shown to have been dissolved.

2. ——: *How established.* The relation of principal and agent may be inferred by implication from the acts of the parties, as well as shown by deeds, or informal writings, or verbal delegation.

3. ——: —— *as to corporations.* This is equally true of the agents of corporations.

4. ——: *Dealings of agent with principal.* It is the duty of persons holding confidential relations, of whatever nature, with others, to put themselves on terms of perfect equality, by furnishing full, exact and truthful information of all matters which enter into a negotiation between them.

5. ——: ——. If they fail to do so, they are liable to lose the entire advantage of the transaction.

6. ——: ——. General allegations of having done so, made by the agent, are insufficient. It is his duty to inform the court precisely of the information which he did impart to his principal, so that the court may judge whether he has made a full and fair disclosure.

7. CORPORATIONS: *Act of members.* A corporation whose governing power is vested in a board of directors, is not bound by the act of its stockholders.

This was an appeal from a decree rendered by Mr. Justice CROUNSE, sitting in the District Court for Douglas county. The facts are fully stated in the opinion of the court.

The arguments consisted mainly of the examination of questions of fact, raised upon the record. It is not deemed worth while to set out the points thus argued.

*J. M. Woolworth,* for the Columbus Company, contended,

I. That Hurford being shown by the record to have acted as the plaintiff's agent, made the purchase for its benefit, and cited, *Lees* v. *Nuthall,* 1 *Russ. & My.,* 53, *affd.;* 2 *My.*

& *Keen*, 819 ; *Faucett* v. *Whitehouse*, 1 *Russ.* & *My.* 132 ; *Taylor* v. *Salmon*, 2 *Cromp.* & *Mees.* 136 ; *Church* v. *Sterling*, 16 *Conn.* 387 ; *Parkhurst* v. *Alexander*, 1 *John. Ch.* 394 ; *Reed* v. *Warner*, 5 *Paige*, 650 ; *Sweet* v. *Jacocks*, 6 *Paige*, 364 ; *Massie* v. *Watts*, 6 *Cranch*, 143 ; *Irvine* v. *Marshall*, 20 *How.* 558.

II. The plaintiff is entitled to so much of the property purchased as its note against Mitchell, paid for.—4 *Kent's Comm.* 305 ; 2 *Story's Eq. Jr.* §§ 1201–1210 ; *Boyd* v. *Mc Lean*, 1 *John. Ch.* 582 ; *Powell* v. *Monson*, 3 *Mason*, 362 ; *Seaman* v. *Cook*, 14 *Ill.* 501 ; *Oliver* v. *Piatt*, 3 *How.* 333.

III. The release alleged in avoidance of the liability of Hurford and Redick, for the retention of the ferry interests, purchased for the plaintiff, and partly with its means, is invalid and void, for several reasons.

1. It was made by individual stockholders, and not by the governing body of the corporation.—*Angell* & *Ames on Corpo.* §§ 151–164 ; *McCollough* v. *Moss*, 5 *Denio*, 567.

2. It was obtained by fraud, which fraud consisted in several circumstances.

3. Hurford and Redick being at this time in confidential relations with the plaintiff, it was incumbent on them to establish the perfect fairness of this transaction, and that the release was supported by an adequate consideration. Having failed to do that, the defence fails.—4 *Kent's Comm.*, 6 30, n. (*b*). *Story on Agency*, §§ 211 *and* 212 ; 1 *Story's Eq. Jr.* § 307, 312 ; *Butler* v. *Haskell*, 4 *Dessau*, 651 ; *Hunter* v. *Atkins*, 4 *My.* & *K.*, 113 ; *Edwards* v. *Meyrick*, 2 *How.* 61 ; *Howell* v. *Ransom*, 11 *Paige*, 538 ; *Whelan* v. *Whelan*, 3 *Cowen*, 537 ; *Greenleaf's Estate*, 14 *Pa. State*, 489.

*J. I. Redick*, for the defendants, argued the case upon the facts alone.

MASON, Ch. J.

This action was commenced on the chancery side of the District Court by the Columbus Company against O. Perry Hurford and others, who claimed to be the owners of the franchise and privileges secured to the Elkhorn and Loupe Fork Bridge and Ferry Company, to establish and enforce a claim set up by the complainant to an interest in said bridge and ferry company, and to be admitted to membership therein, and to share in its earnings and profits.

The complainant sets forth and alleges in its bill, that one James C. Mitchell, about the first of January, 1860, was the principal stockholder in said bridge and ferry company; that the complainant being desirous of purchasing said Mitchell's stock in said company, employed the defendant, O. Perry Hurford, to purchase the same for it, and that said Hurford undertook to make such purchase; that said Hurford having sometime thereafter associated with him one John I. Redick, with the intent to defraud the complainant, represented to the complainant that said Mitchell peremptorily declined to sell said stock to the complainant, on the ground of a bitter hostility existing between said Mitchell and the complainant; that beleiving these representations to be true, the complainant directed the said Hurford and Redick to purchase said stock ostensibly in their own names, but in fact, on behalf and for the benefit of the complainant, furnishing to said Hurford and Redick a certain note held by the complainant against said Mitchell, for the sum of $1,767.41, to be used as part consideration for the purchase of said stock, and assigned said note to said Hurford and Redick for that purpose, they paying and the complainant receiving no consideration therefor; that said Mitchell having demanded a further consideration in money for said stock, one John Rickley consented to advance it to the complainant, and directed said Hurford and Redick to apply certain moneys in the hands of said Redick, and certain indebtedness due from said Mitchell to

said Rickley and in said Redick's hands for collection, towards such purchase in behalf of the complainant, and that said complainant relying upon such application of said moneys and indebtedness, did not procure by other means the funds necessary for such purchase ; that on or about the 14th day of February, A. D.; 1860, said Hurford and Redick having associated with them one John Hughes and one John H. Green, they, the said Hurford, Redick, Hughes and Green, purchased from said Mitchell, all the stock and franchise in said Bridge and Ferry Company, and that the only consideration paid therefor, except some small matters the amount of which was unknown to the complainant, was the said note of the complainant, and the said moneys and debts of said Rickley advanced for that purpose ; and, that in violation of the said undertaking of the said Hurford and Redick, the said Hurford, Redick, Hughes and Green, refused to transfer said stock to the complainant, and excluded the complainant from membership in said company.

The complainant further alleges, that said Hurford and Redick, by some means unknown to the complainant, settled with said Rickley for said moneys and debts of said Rickley, used in the purchase of said stock, but that the same was done without its knowledge and consent ; that by divers assignments and transfers all the stock and property of said Ferry Company, has become vested in said O. Perry Hurford, Thomas J. Hurford, and Noble R. Hays, but that said Thomas J. Hurford and said Hays had full knowledge of the complainants' rights in the premises ; that said Ferry Company since the 14th day of February 1860, has been in continual and successful operation, and has accumulated large profits exceeding to a considerable extent all sums expended in carrying on its business : that as soon as complainant learned of the purchase of said stock from said Mitchell by said Hurford and Redick, and at divers times

since that day, it applied to them and to the successive members of said Bridge and Ferry Company to assign said stock to the complainant and for an accounting etc., and has offered to reimburse said defendants for any and all sums paid to said Mitchell and Rickley, or either of them, for said stock, etc ; that by reason of the premises, the purchase made by said Hurford and Redick of said stock and franchise of said Ferry Company from said Mitchell, was made for the benefit, and is now held by said defendants in trust for the complainant, and that the complainant is entitled to the said stock and franchise of said Ferry Company, upon the repayment to said defendants of whatever sum or sums were paid to said Mitchell and Rickley in the purchase of said stock and franchise, out of the profits and net income from the business of said Ferry Company, and asks that an accounting may be had of the amounts so paid for said stock and franchise, by said Hurford and Redick, and of the business of said Ferry Company since said purchase, and that the said defendants may be required by the decree of the court, to transfer said stock and franchise to said complainant, and to pay over to the complainant any balance that may be found in their hands, after re-imbursing them for such sums and amounts as have been paid or sustained by them, by the purchase of said stock and franchise, and in the management of the business of said Ferry Company, and for general relief.

To said bill, the defendant, O. Perry Hurford, answers in substance, that the complainant is not a corporation and doing business in Platte county, Nebraska, as alleged in said bill, that said Mitchell never acted as treasurer of the present Columbus Company, but that the company for which said Mitchell did act as treasurer and received said sum of $1,767.41, dissolved by its own act about the spring of 1859 ; that he never undertook or agreed to buy said ferry franchise for the complainant and that he never agreed

THE COLUMBUS COMPANY v. HURFORD.

to purchase said property ostensibly in his and said Redick's names, but in trust for said complainant, or for the use and benefit of said complainant, and that he never agreed as the agent or otherwise of the complainant, to purchase said Mitchell's interest in the stock and property of said ferry company, and turn in part payment therefor, the said note of said Mitchell, but that said note was left with said defendant by one John Wolful, who asked said defendant to use his personal influence with said Mitchell, to see if he would not turn out something in discharge of said note ; that Mitchell was insolvent, and the company considered it of no value ; that he never had any conversation with the complainant about the purchase of said stock before the purchase thereof by said Hurford and others, but that he did ask said Mitchell to sell said franchise and ferry property to said complainant, and that said Mitchell peremptorily refused, claiming that one John Hall owned or claimed to own it; that the said Hurford, in connection with John I. Redick and John Hughes, bought said franchise and ferry property for fifteen hundred dollars, and paid that sum therefor, and that the note referred to was given to said Mitchell partly in consideration of said transaction; and that said Mitchell at the same time gave to said Columbus Company, several lots in the town of Columbus in further consideration of giving up said note, but that in fact, said note formed but little part of the consideration of said purchase ; that in said transaction about $79 or $80 of the claims in said Redick's hands for collection against Mitchell and in favor of Rickley was used, and that sometime thereafter said Hurford paid or caused to be paid said amount to said Rickley ; admits that said Thomas J. Hurford and Noble R. Hays, are joint owners in said property ; that said ferry has been kept up by the defendant at great expense, but denies that they have accumulated large profits ; that a full and complete settlement was made between said Com-

pany and said Hurford and Redick in regard to said pur-
chase and the giving up of said note to said Mitchell, and
that said Hurford and Redick offered to assign to said com-
plainant said stock and franchise, if said complainant would
refund to them the amount so paid by said Redick, Hurford
and Hughes, to said Mitchell, but that the complainant
refused the same; that said Hurford, Hughes, Redick and
John Green, expended about eight hundred dollars in
repairs, etc., necessary to run said ferry, and that since then
said defendants have been compelled to make additions and
permanent improvements to said property amounting to
over $2,000, and denies that they hold said property in trust
for the complainant.

The answer of said defendant Hays, admits that he owns
one fourth interest in said ferry company, that he bought
the same from O. Perry Hurford, that at the time of his
purchase he had no knowledge or notice whatever of any
right of the complainant, and that he paid for his said inter-
est the sum of one thousand dollars; that some profits have
accrued from the business of said ferry company, the amount
of which he cannot state, and claims to be a *bona fide* pur-
chaser.

The answer of Thomas J. Hurford denies all the allega-
tions of the bill, for want of information, etc., excepting that
he heard of the purchase of Hurford, Redick and Hughes,
of said franchise, but knows nothing of the manner or con-
sideration of said purchase; that he did not know of the
settlement between complainant and Hurford and others;
that he bought one-fourth interest in the ferry in 1860, in
good faith of one John H. Green and paid about $700 there-
for, and had no notice or knowledge of any rights of com-
plainant.

To these several answers the complainant replies gen-
erally. The evidence taken in this case shows that the
defendant, O. Perry Hurford, was employed by the com-

THE COLUMBUS COMPANY v. HURFORD.

plainant, the Columbus Company, as its agent to settle in some manner the Mitchell note of $1,776.41, and that it was used by said Hurford, or Hurford, Redick, and Hughes, in the purchase of the ferry interest from said Mitchell, as a part consideration. The witnesses Redick and Hurford testify, that it formed a small part of the consideration of said purchase, but the letter of Hurford to John Rickley, dated February 14, 1860, the day on which said purchase was made, shows that in said purchase, $1,500, was applied on the Mitchell note. Exhibits B and C, dated February 23, 1860, show that at that time, the parties understood the amount to which the note was used in said purchase was $1,531.75, and the balance of the note might have been and very likely was satisfied by the conveyance of the lots in Columbus from Mitchell to the complainant.

The evidence shows that after said purchase, the parties met at Columbus to adjust the matter of the purchase ; that a meeting of the members of the Columbus Company (the complainant) was called ; that said Hurford and Redick offered to transfer to said complainant their said purchase upon being reimbursed the amount of money paid by Hurford, Redick and Hughes to Mitchell, in addition to the amount applied upon the Mitchell note ; that the members of the company present declined to reimburse them ; that upon talking over the matter of Mitchell's note, it was contended by Hurford and Redick, that Mitchell was insolvent, and that the note was worthless or of very little value, and that unless the complainant would reimburse them for the money they had paid, etc., they desired a full discharge from the complainant of all liability to it on account of said note ; that some dissatisfaction was expressed on the part of some of the members of the said Columbus Company to this proposition, but that finally it was settled upon, that in consideration that the said purchasers of said ferry should maintain and keep a ferry at or opposite the town of Colum-

bus, and cross the members of said Columbus Company, on said ferry, free of charge, certain members of the complainant, released and discharged the said Hurford, Redick, Hughes and Green from all liability on account of said note; that this arrangement or settlement of the matter was reduced to writing and signed by the President and Treasurer of said Columbus Company, a copy of which appears in the record as exhibit " B" ; that a committee of the members of said Columbus Company, was also appointed at said meeting at the suggestion of Hurford and Redick, who investigated the matter and recommended, by their written report, such arrangement, a copy of which was also attached to the record as exhibit "C;" that said Ferry Company did, in pursuance of such adjustment, establish and maintain a ferry at or opposite the town of Columbus, but that the members of said Columbus Company were not at all times passed over said ferry free of charge. The evidence shows that said ferry was kept in successful operation by said Ferry Company, but it does not show satisfactorily the amount of the receipts and expenditures during its operation by the defendants.

The cause was heard in the court below upon the pleadings, proofs, exhibits, and master's report, and a decree rendered against O. Perry Hurford for the sum of sixteen hundred dollars and costs, and that the bill be dismissed as to the other defendants with costs, from which decree the defendant Hurford appealed. The complainant also filed notice of appeal, and the cause now comes up and is heard by this court on the appeal of Hurford.

The history of the note which the Columbus Company held against Mitchell, appears from the record and proofs to be about as follows: In 1858, Mitchell was Treasurer of the Company, and as such received a considerable sum of its money, the exact amount does not distinctly appear from the record or proofs. Some disagreement between the

Company and Mitchell having sprung up, and he being unable or unwilling to account for this money, Hurford and Redick, on behalf of the Company, undertook, either voluntarily or at its request, to secure this demand, and they succeeded; but afterwards, for some reason not explained, the Company cancelled the securities thus obtained from Mitchell, and in place thereof took the note in question. It further appears that in August, 1859, the Company being indebted to one Kasserman in the sum of $1,500, sent the note to Hurford with a view of having Mitchell assume the debt to Kasserman and credit the amount upon the note. He did not succeed in effecting this, but returned the note to the Company. In June, 1860, the note was again placed in Hurford's hands, and it is at this point, that this controversy begins.

The first question presented is, in what capacity and for what purpose the note was then placed in Hurford's hands, whether as an agent or in a fiduciary capacity, or simply to do with it as he pleased.

The person who gave the note to Hurford was John C. Wolful, the president of the Company; so Hurford says. Wolful testifies that when he gave the note to Hurford, he told him that he did so, for the purpose of having him exchange it with Mitchell for the ferry owned by Mitchell. Weaver and Kummer also testify that the Company authorized Wolful to place the note in Hurford's hands for that purpose. Rickley, the secretary of the Company, swears that he had repeated conversations with Hurford on the subject of the contemplated transaction with Mitchell, and it was distinctly understood that Hurford was acting for the Company. It also appears, from the testimony of these four witnesses, that Hurford represented to the Company, or its officers, that Mitchell would not give the ferry interest for the note " even up " (as it was expressed), and they told him to make the exchange, he contributing what money

was necessary as his part of the purchase money, and he to be interested with them in the property thus to be secured. I regard the circumstance of his receiving the note and afterwards reporting progress to the Company, as clearly indicating that he then understood that he was acting for them in purchasing the ferry to the extent at least of the value of the note. But now a new difficulty seemed to intervene. Mitchell refused to sell to the Columbus Company on any terms, because he had quarreled with its members, and was willing to injure himself that he might injure them. This is what Hurford reported to the Company. In the bill it is charged that this was false. I do not deem it very material whether this representation was true or false. It is not shown to be false. It is enough that it was acted upon both by Hurford and the Company as true ; by Hurford's drawing up of a formal resolution to be passed by the Company's directors, authorizing Wolful to transfer the note to Hurford and Redick, and have Wolful assign it formally to them. It is not pretended that any consideration whatever was paid by him or them to the Company for its assignment. These facts are testified to by the four witnesses mentioned above, so clearly and emphatically, that we cannot doubt their truth. This resolution was uncalled for by the circumstances. The reason assigned for this action was to deceive Mitchell as to whom he was dealing with, he being unwilling to sell to the company, but quite willing to sell to Hurford. Even if it was thought necessary or best or proper to do so, the formality employed was not required. The resolution would not be likely to be made known to Mitchell. Why, then, was such formality employed ? It certainly appears to have been in order by so decisive and conclusive an act, to connect the company with the transfer irrevocably. This transfer of the note to Hurford without consideration, when considered with the surrounding circumstances, shows clearly that Hurford had as-

THE COLUMBUS COMPANY *v.* HURFORD.

umed, for the Company, to act in a fiduciary capacity in this matter. If this is not so, then the transfer was made to enable Hurford to use the note for the Company's benefit, which is the very point contended for by the complainant; so that it makes but very little difference which position is true.

The testimony and attending circumstances show very clearly that the note was placed in Hurford's hands for the purpose for which he used it. Hurford testifies that if the purchase of the ferry, as at first proposed with the note, "even up," had been effected, he would have acted for the Company as its agent. When or how that agency was dissolved he does not pretend to say. It was not shown to have been dissolved; and the established presumption of law is that it is continued (1 *Greenleaf's Evidence, Sec.* 41–2). But we are not left to resort to presumption in this case. Hurford used the note in making the purchase. What right had he to do this, if he was making it for himself and not for the owners of the note? He did it, as a matter of course, under the very authority with which he first received the note from Wolful, and when he himself admits he took the note to use, as he did use it, this is decisive of the matter. Again, on the 19th of January, 1860, he wrote a letter to Rickley, the Company's secretary, in which he says "the chances are for success" in effecting the purchase; and he also says that he and Redick made Mitchell believe that it was for themselves *alone* they wanted to buy. This letter shows they had been, or pretended they had been, deceiving Mitchell, whereas the fact was they were buying, partly at least, for some one else. Who was this some one else? We think it was the Columbus Company.

I do not think any one reading this record can doubt for an instant that Hurford was the agent of the complainant

in this transaction, or acted in a fiduciary capacity for the complainant in negotiating and effecting the purchase.

Leaving out of view the question of good morals and fair dealing which might be raised in this case, the law is perfectly plain that such a course of conduct, as this record shows was pursued between the parties, will constitute the relation of principal and agent. An agency may be inferred by implication, from the acts of the parties, as well as by deeds or verbal delegation or informal writings. This was the rule of the civil law.—*Pothier Lib.* 3, *Tit.* 3, *No.* 3; 1 *Domat. B.* 1, *Tit.* 15, *Sec.* 1, *Art.* 5. And the wisdom of the common law follows the civil law by adopting it.

It is true, that by the ancient common law, corporations aggregate were considered incapable of making a contract, or of appointing agents or attorneys to do any binding act, except by deed or power in writing, under the corporate seal. But the existing law on the subject is, that a corporation may be bound by the acts of its agents, although not under its corporate seal, and even when they are not reduced to writing, except in those cases where the statute of frauds otherwise expressly provides.

The agency may be inferred from facts and circumstances, without the violation of any known rule of evidenc. *American Insurance Co.* v. *Oakley*, 9 *Page*, 497; *Perkins* v. *Washington Insurance Co.*, 4 *Cowan*, 645; *Pickett* v. *Pearson*. 17 *Vermont*, 470. Almost all the cases in which the question of the agency arose, were between the alleged principal and a third party, or where the effect was in some way to bind the principal by the act of the agent. But the question is not so presented here. Here the agent has done an act, employing the property of the principal in the doing of it, and it is the principal who insists on the agency against the agent.

*Lees* v. *Nuthall*, 1 *Russ. & My.* 53, was this: The wife

of the plaintiff and her sister, as administratrixes of their father, were entitled to a mortgage debt charged on the premises in question. The plaintiff desired to become the owner of the equity of redemption which was in one Walker, and he employed Nuthall to negotiate the purchase. Various attempts were made to accomplish this object, but without success. Some years afterwards, fresh negotiations took place, and Walker proposed to sell to the plaintiff for £1,200. This letter was dated March 25. The following day the plaintiff sent his son to Walker to inform him that he accepted his offer, and on the 27th he also sent his son to Nuthall and informed him of what had transpired, and requested him to draw the necessary agreement of purchase. Nuthall did not express any unwillingness to act as agent of the plaintiff, or intimate that he was in treaty for the purchase of the property on his own account, but within a day or two afterwards entered into an agreement in his own name, dated the 29th day of March, for the purchase of the premises for £1,000. Nuthall, by his answer, claimed the benefit of the purchase, stating that for two months before the 29th of March, he had been in treaty with Walker on his own account, and that he did not, in the transaction, consider himself the attorney of Lees.

Sir John Leach, the Master of the Rolls, held that Nutball having been originally employed by the plaintiff as his agent for the purchase of the estate, was held to the duties of that relation, and that the purchase in his own name was to be held for the benefit of his principal, and rendered a decree according to the prayer of the bill with costs.

The case was carried by appeal, before Lord Brougham; who affirmed the decree of the Master of Rolls, 2 *My. & Keen* 819.

I have selected this case for mention here, out of a great number to the same effect, because in its facts, it is apposite

and simple, and has been repeatedly cited and approved by the most learned judges both in England and in this country. In that case, and in the one at bar, an agency was admitted to have existed at one time between the parties. The negotiations in both, as at first conducted, failed, and were not renewed for some time, and when they were renewed and consummated, it was by the agent in his own name, and as he intended for his own benefit.

When, now, we consider these facts which are either admitted or proved beyond a question, that on a previous occasion Hurford had acted as the agent of the company, in dealing with Mitchell in reference to its claim, out of which the note grew; that again he endeavored on its behalf to effect a settlement of it, by a novation with Kasserman; that he recieved the note again to exchange it for the ferry, and acted on the Company's behalf; that he was requested to join in the purchase by the Company, by contributing what money Mitchell required; that he constantly reported progress to its officers; that at the time his efforts were likely to be successful, he admitted impliedly, but most distinctly, that he was acting for some third party, which must have been the Company; that he used the note in the purchase, and effected the wishes of the Company as he had been requested; when we consider these facts, it is impossible to resist the conviction, that he was the agent of the complainant, and that as such he is bound to give it the benefit of the purchase.—*Faucett* v. *Whitehouse*, 1 *Russ & My.* 132; *Taylor* v. *Salmon*, 2 *Cromp & Meeson*, 136; *Church* v. *Sterling*, 16 *Com.* 387; *Parkhurst* v. *Alexander*, 1 *Johns. Chancery*, 394; *Reed* v. *Warner*, 5 *Paige*, 650; *Sweet* v. *Jacocks*, 6 *Paige*, 364; *Massie* v. *Watts*, 6 *Cranch*, 143; *Irvine* v. *Marshall*, 20 *How.* 558; *Flagg* v. *Mann*, 2 *Sumn.* 286.

It now becomes material to inquire, how much of the purchase price of the ferry, the complainant's note formed. And here too Hurford has himself supplied the proof. In his

THE COLUMBUS COMPANY v. HURFORD.

letter, dated the 14th of February, 1860, addressed to Rickley the Secretary, he announces the purchase, of which in his previous letter of the 18th of January, he says, "the chances are for success," and he then says that the purchase price was $3,000, and that the note paid $1,500, of that sum. Wolful, Kummer and Rickley, also swear that he so informed them.

But the defendants allege that after the purchase from Mitchell had been made by them in their own names, the complainant ratified it, and released them from any claim such as is here alleged. Several objections are urged against this release.

The complainant is a corporation. By its articles of incorporation, it is provided that its business shall be conducted by a board of directors consisting of five members, one of whom is to be the President of the Company, and a Secretary and a Treasurer. This alleged release was made by a committee of five, appointed at a meeting of the members and from the body of the members of the Company. It was not the act of the directors, nor did they ever ratify it. On the other hand, when it came to the knowledge of the secretary, he wrote Hurford, protesting against it.

*McCollough* v. *Moss*, 6 *Denio*, 567, was an action of debt brought against one of the stockholders of the Rossie Lead Mining Company, by virtue of its act of incorporation, rendering them personally liable for the payment of its debts. The action was founded on a promissory note made in the name of the company and signed by the president, who was the general managing agent, and by the secretary. The note was one of four, given to secure $15,000, and interest, for certain property sold to and received by the Company. The charter provided that the affairs of the Company should be conducted by five directors, a majority of whom formed a board for the transaction of business. It was not shown in evidence that the board of directors

authorized the president and secretary to give the note, but it appeared that at a meeting of the stockholders a resolution was passed purporting to confer the authority.

LOTT Senator, delivering the opinion of the court on this subject, says : " Where a charter vests a board with the power to manage the concerns of a corporation the power is exclusive in its character. The corporations have no right to interfere with it, and courts will not, even on a petition of a majority, compel the board to do an act contrary to its judgment (*Angel and Ames on Corpo.* p. 121, 151 to 164.) The stockholders as such, in their collective capacity, could do no corporate act. It is one of the fundamental conditions of the contract into which the corporators have entered, by becoming members of the corporation, that its concerns shall be managed in the manner prescribed by the act of incorporation, and from this no essential departure can be made."

But it is said that this is a technical objection to the form of the release, and in a Court of Equity, should not be permitted to prevail. I do not think it is such an objection as a Court of Equity could overrule. But even if it were, it must, in the circumstances of the case, have its full force, because the release was obtained fraudulently.

The meeting at which the committee was appointed, was called by or at the instance of Redick and Hurford, and its members were named by them. With a single exception, it was composed of persons who knew but little of the matter, or of the company's affairs. That exception was one Green. The bill charges that at that time he was interested with Redick and Hurford in the purchase. This they both positively deny in their depositions, and swear that he did not become interested with them until afterwards. But the release is produced by them. It was drawn by Redick at the time and is signed by the committee, and among its numerous recitals it is stated, that

Redick, Hurford, Hughes, and this very man, Green, had purchased this ferry. Their next step was to meet this committee of their own selection and make certain representations about the purchase from Mitchell. Hurford and Redick, as well as the complainant's witnesses swear, that they stated that the note formed a very small part of the consideration, and was worthless. We have already seen to what extent this representation was true. In fact Hurford's own account of the negotiations with Mitchell, shows that the note formed at least one quarter of the consideration. It is true Hurford swears that he made a full and truthful statement of precisely what was paid to Mitchell, and that the company could have investigated the matter fully for themselves, and could not have been misled. I do not attach very great value to such general statements. He should have informed us what he did say, and left us to judge whether it was a full, fair account of the matter. What he is shown to have disclosed, demonstrates that his statement was not a full and fair disclosure of all the facts. Besides, he might have told this committee exactly what was paid, and not concealed the real proportion which the note formed of the whole consideration.

And as to any opportunity of the committee to investigate the matter, they could do nothing but inquire of these parties as to the facts. They could not come down from Columbus, where the investigation, such as it was, was being made, and learn the facts from Mitchell, for Redick, Hurford, Hughes and Green, were then pressing the matter to an immediate conclusion. They did not propose to remain but one or two days. They were detained by a storm longer than they intended, but this gave the Company no opportunity to inquire elsewhere after the facts. Their own account shows that they gave the Company, only the alternative either to lose all it had in the matter, or pay at once all that had been advanced. One of the committee swears

that they were left to their choice between these two courses only. I am satisfied no sufficient opportunity was given to inquire elsewhere for the facts. But it is not material whether there was or not, considering the relations of the parties. Hurford and Redick both occupied confidential relations to this company. As early as 1858, they had undertaken a settlement with Mitchell for it, and had continued in one way and another to act in its behalf. Hurford was a director, and, as the complainant's witnesses say, a confidential adviser and friend, and Redick was counsel to the Company—at least had been and was then so considered by the Company. It was their duty to explain their transaction with Mitchell so fully that when the Company came to deal with them they would be on equal footing, or in other words, to communicate to the company every fact relating to the transaction within their knowledge. This duty grew out of the relation they sustained to the Company. For not doing so, they are liable to lose the entire advantage of the alleged settlement, and on this subject the cases are numerous. A case very recently decided in the English Chancery, is that of *Tate* v. *Williamson*, *Law Reports*, 1 *Equity Cases*, 528, 2 *Ch. Ap.* 58. It was first heard and decided by the then Vice-Chancellor Woods, now Lord High Chancellor, and his decree was affirmed by Chelmsford, L. C. It is especially interesting here because the fiduciary relation, out of which the liability grew, was rather indecisive, and there was not proper advice given to seek information in a quarter where it could be had. The facts of the case were briefly these. Tate, a young man, aged twenty-three, was entitled to a moiety of a freehold, the entirety of which brought in about £440 per annum. He had been dissipated at college, and had contracted debts with tradesmen and money lenders, amounting to £1,000, which were pressing him. His father was estranged from him, and he had formerly applied to and received from his

great uncle advice and assistance. He now made application to him again for aid. The uncle deputed his nephew, one of the defendants, to meet young Tate at an appointed time and place, to discuss his embarrassments. At this interview the young man refused to allow any attempt to compromise his debts, and said he would sell his moiety of the estate. Upon which the defendant offered him £7,000, payable in installments. The next day Tate accepted the offer. Before the agreement had been signed, the defendant obtained a valuation by a surveyor, estimating the value of the mines under the entirety, at £20,000. The sale was completed without this valuation being communicated to Tate. He having died, his heir filed this bill, impeaching the sale. In his judgment, Sir W. Page Wood, V. C., says : "The broad principle upon which the court acts in cases of this description is, that whenever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed, to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest communication of every particular, resting in the breast of the one who seeks to establish a contract with the person so trusting him. This unfortunate young man being in difficulties of a serious character, or rather which were in his opinion serious, the defendant, Robert Williamson, as representing his uncle, H. H. Williamson, Tate's great uncle and trustee, took upon himself to advise the young man in reference to the arrangement of his difficulties. The young man, having then said that he was determined to dispose of his property, it was then absolutely impossible for Robert Williamson, filling as he did that position of confidential adviser, to enter into any treaty for the purchase of that estate, without communicating to him every particle of information that he himself possessed with respect to

its value. One most important piece of information, Cope's report as to the value of the minerals, which he put for the whole estate, at £20,000, being in respect of a moiety £3,000 more than the defendants gave for it, minerals, surface and all included, was during the negotiations obtained by the defendant and kept back from the person with whom he was dealing. This circumstance renders it at once impossible that the contract can be maintained. It has been said : ' What could Robert Williamson have done ?' To which I answer, ' Why did he not tell this young man to consult some mining surveyor, or Mr. Cope, whom he had himself consulted.'   \*   \*   \*   It is a fallacy to contend that Robert Williamson's mission was limited to seeing if Tate's debts could be compromised, and that his agency ceased with the refusal of Tate to allow his debts to be compounded for." The Lord Chancellor, in his judgment, reviews the whole case, and states the principle in even more decisive and exact terms.

Nor do we think there was any ratification of the release in making of the deed by the mayor of Columbus to the purchasers, for that was the deed of a public officer who was bound to convey to a party occupying the premises, who appeared to have a right to the deed. It was not in any sense nor in any view the deed of the complainant.

The claim interposed for services rendered by the defendant Hurford to the complainant in securing the claim against Mitchell, and negotiating for the ferry, should be allowed the complainant to the extent of what the same was reasonably worth.

The defendant Hurford should be allowed the expense of the management and control of the ferry, the same to be deducted from the gross profits or income of said ferry. He should not be allowed for crossing the members of the Columbus Company free. The defendant Hurford, should

THE COLUMBUS COMPANY v. HURFORD.

be allowed the item of seventy-five or eighty dollars paid to Gutschalk.

The complainant should be charged with the actual value of all property and money received by them from the defendants, in consideration of the pretended release and settlement.

The defendants must be charged with the value of one-half the ferry and franchise, together with the profits and proceeds thereof. It only remains to be determined how this shall be apportioned among the defendants.

There is no evidence showing that Thomas J. Hurford purchased his interest with notice as to the complainant's claims. As to him the bill must be dismissed with costs. Hays did have notice when he bought, and as he purchased from the principal defendant, O. Perry Hurford, he would have a remedy over against him.

The bill prays, among other things, that the right of the parties may be declared by the court in the decree. It will cause further litigation to settle the relations of the defendants as between themselves in the decree, and it will therefore provide that the amount to be paid be first made out of O. Perry Hurford, and then in event of his being unable to answer for the whole judgment, execution for due proportion should go against Hays. In order to determine the amount for which Hays may be liable, we must know the date of his purchase, which does not appear in the master's report. And in order to render a final decree, the account between the complainant and defendants must be stated upon the basis of this decree.

A reference must therefore be had touching these matters, and also the rents, profits, proceeds, business and expenses of the concern.

Cause remanded.